# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| DAN JESSUP,<br><br>        Plaintiff,<br><br>vs.<br><br>LUCKY'S MARKET HOLDINGS, LLC, dba LUCKY'S MARKET, Colorado corporations,<br><br>        Defendants. | CV 15-40-BLG-CSO<br><br>**ORDER** |

Plaintiff Dan Jessup ("Jessup") filed a Complaint asserting the following claims against Defendant Lucky's Market Holdings, LLC ("Lucky's"):

    Count One:     Breach of Contractual Promise
    Count Two:     Breach of Implied Covenant
    Count Three:   Wrongful Discharge
    Count Four:    Defamation
    Count Five:    Intentional Infliction of Emotional Distress
    Count Six:     Negligent Infliction of Emotional Distress

*See ECF 1.*[1]

---

[1] "ECF" refers to the document as numbered in the Court's Electronic Case Files. *See The Bluebook, A Uniform System of Citation,* § 10.8.3.

Now pending is Lucky's Motion to Dismiss (*ECF 3*). Having reviewed the parties' arguments and the applicable law, the Court will grant the motion in part, as set forth below.

I.  **BACKGROUND**

The following facts are alleged in Jessup's Complaint and are, for considering Lucky's motion to dismiss, assumed to be true.

In early 2013, Lucky's began actively recruiting Jessup to work at one of its new store locations. In discussions, Lucky's promised Jessup various benefits, including the promise of a "break-even bonus of $10,000.00 if achieved within the first 90 days of operations." ECF at ¶ 7. On December 12, 2013, Lucky's offered Jessup the position of Store Director at a new store in Billings, Montana. Jessup accepted the offer and relocated to Montana from Nevada, resigning from a long-term, highly-compensated, and secure employment relationship in Nevada. After relocating, Jessup began overseeing the necessary start-up operations and the opening of the new Billings store.

On May 22, 2014, Lucky's Human Resources Manager and its Chief Operations Officer suddenly and unexpectedly advised Jessup that his employment was being terminated for unspecified "morale issues." *Id.* at ¶ 10. Jessup had received no prior notice or warnings of

any kind concerning allegations against him. Although he requested additional information, Lucky's provided no further explanation and told Jessup the decision was final. *Id.* at ¶ 10.

After his discharge, Jessup applied for unemployment benefits and then learned that Lucky's had claimed he was discharged for sexual harassment. Despite the falsity of these accusations, Lucky's and its "responsible officers nevertheless continued to assert the same, in a malicious and bad faith effort, aimed at damaging Plaintiff Jessup's professional reputation, as well as to thwart even his attempt to obtain unemployment." *Id.* at ¶ 12. Lucky's "vigorously, relentlessly and maliciously continued to implicate that the plaintiff was guilty of this serious wrongdoing…." *Id.*

## II. **PARTIES' ARGUMENTS**

Lucky's presents two main arguments in support of its motion to dismiss. First, it argues that Montana's Wrongful Discharge from Employment Act ("WDEA") preempts Jessup's tort and contract claims because the WDEA is the exclusive remedy for a wrongful discharge. *ECF 4.* Lucky's argues all of Jessup's claims are inextricably intertwined with the termination and that absent his termination, none of the claims would exist. *Id.* at 5.

Specifically, Lucky's argues that: (1) Jessup's first two claims allege a promise to pay a 90-day bonus, but he did not meet the requirements because he was terminated before reaching 90 days, *id.* at 6; (2) Jessup's tort claims for defamation and for negligent and intentional infliction of emotional distress all arise from the alleged wrongful discharge, *id.*; and (3) Jessup failed to state a claim for defamation because there "is no colorable claim for defamation under the law where an employer investigating complaints against an employee regarding sexual harassment interviews that employee's victims," nor is it defamation to list the reason for his termination on documents submitted to the unemployment office. *Id.* at 6–7.

Second, Lucky's argues that the WDEA claim fails to state a claim because Jessup had not yet finished his probationary period, obviating Lucky's need to demonstrate that Jessup's termination was for good cause. *Id.* at 7–8. It argues that it followed its personnel policies, and that because there was no good cause requirement, Jessup's claim for a violation of the WDEA, based on lack of good cause, fails to state a claim and should be dismissed. *Id.*

In response, Jessup argues that he has sufficiently alleged prima facie claims because: (1) the contractual promise and the breach of

implied covenant claims concern the break-even bonus earned prior to his termination, *ECF 8* at 11–16; (2) the defamation claim is not based solely on Lucky's investigation but instead on statements made to others "in connection with the termination of his employment, and thereafter," *id.* at 20; and (3) the emotional distress claims include allegations relating to the company's attempt to avoid the promised bonus and arise out of the company's post-termination actions. *Id.* at 2. Jessup also contends that he stated a valid WDEA claim, despite his probationary status, because the claim is based on a violation of the employer's policies. *Id.* at 16–18.

In reply, Lucky's argues that the claims based on the break-even bonus are preempted by the WDEA because Jessup is arguing that his discharge was an effort to avoid paying the bonus. It argues that if this was the case, "the claimed bonus would be included in his damages calculation without need for a separate cause of action." *ECF 9* at 4. Lucky's also argues that Jessup is operating under outdated law. It argues that Jessup ignores the portion of the WDEA added in 2001, specifying that "during the probationary period an employee may be terminated 'for any reason or for no reason.'" *Id.* at 5.

## III. LEGAL STANDARD

Dismissal under Rule 12(b)(6) is proper only when the complaint either: (1) lacks a cognizable legal theory, or (2) fails to allege sufficient facts to support a cognizable legal theory. *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013). The Court's standard of review under Rule 12(b)(6) is informed by Rule 8(a)(2), which requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–678 (2009) (quoting Fed. R. Civ. P 8(a)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. A plausibility determination is context specific, and courts must draw on judicial experience and common sense in evaluating a complaint. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).

## IV. ANALYSIS

### A. WDEA Claims (Count Three)

The Court will first address Jessup's wrongful discharge claims asserted in Count Three. The WDEA provides:

(1) A discharge is wrongful only if:

> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
>
> (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
>
> (c) the employer violated the express provisions of its own written personnel policy.

(2)(a) During a probationary period of employment, the employment may be terminated at the will of either the employer or the employee on notice to the other for any reason or for no reason.

MCA § 39–2–904. Unless otherwise provided, the probationary period is 6 months from the date of hire. *Id.*

Jessup asserts two claims for a violation of the WDEA. First, he asserts that his discharge was not for good cause or for a legitimate business reason. *ECF 1* at 10. Second, he asserts that Lucky's "violated provisions of its express personnel policies in discharging him . . . including those pertaining to his right to corrective disciplinary steps prior to termination;" to have been adequately apprised or notified of

the charges against him; afforded the right to defend himself against the allegations; and to participate in any investigation. *Id.* at 11.

### 1. Good Cause

Regarding Jessup's claim that he was discharged without good cause, Jessup does not dispute that he was still in his probationary period of employment. *ECF 8* at 17. In fact, he does not address any of Lucky's arguments regarding this claim. *Id.* at 16–19. Instead, Jessup only discusses his WDEA claim premised on personal policy violations. *Id.*

Based on the allegations in the Complaint, Jessup was provided a written offer of employment on December 12, 2013. *ECF 1* at 5. Although the Complaint does not indicate the actual start date for Jessup, his employment was terminated on May 22, 2014. *Id.* Jessup does not assert that Lucky's had established a set probationary period that would differ from the 6 months created by the WDEA. Based on these dates, even if Jessup had started at the earliest possible date, December 12, 2013, he would still be considered a probationary employee at the time of his termination. Lucky's did not need good cause to terminate him during his probationary period. *See* MCA § 39–

2–904(2)(a). Thus, the motion to dismiss will be granted as to Jessup's first cause under his WDEA claim.

## 2. Personnel Policies

Jessup makes a second claim under the WDEA, arguing that Jessup was terminated in violation of Lucky's express personnel policies. *ECF 1* at 12. He argues that even a probationary employee is protected under the WDEA, section 39–2–904(1)(c), for a termination in violation of the employer's express personnel policies. He argues that subsection (1)(a) and (1)(c) do not distinguish between probationary and non-probationary employees, and therefore a basis exists to state a claim under those provisions despite probationary status. *ECF 8* at 17.

In support of his position, Jessup cites *Motarie v. N. Montana Jt. Refuse Disposal Dist.*, 907 P.2d 154, 156 (Mont. 1995), in which the Montana Supreme Court found that a basis for a WDEA claim did exist for a probationary employee who alleged he was fired in retaliation for reporting a violation of public policy. The Court explained that the "statutory prohibition on termination in retaliation for the employee's refusal to violate public policy does not distinguish between probationary and non-probationary employees." *Id.* But in 2001, six years after *Motarie*, the WDEA was amended to add a new subsection,

specifying that during an employee's probationary period, the employment may be terminated for any reason or for no reason. MCA § 39–2–904(2)(a).

In at least one case after the 2001 WDEA amendment, the Montana Supreme Court declined to address whether probationary employees can state a claim under subsections (1)(a) and (1)(c), as a result of the new language. *Richie v. Town of Ennis*, 86 P.3d 11, 15 n.2 (Mont. 2004). But the Court later found that allowing an employee discharged during her probationary period to bring a claim under the WDEA for refusal to violate public policy or for reporting a violation of public policy would require the Court "to substantially re-write critical provisions of the Act," contrary to Montana's rules of statutory construction. *Blehm v. St. John's Lutheran Hosp.*, 246 P.3d 1024, 1028 (Mont. 2010). There, the Court found that despite previous interpretations, the 2001 amendment to the WDEA specifically provides that employment may be terminated for any reason or for no reason during a probationary period. *Id.* at 1027–1028.

Here, Jessup was unquestionably within the probationary period of his employment. As a result, Lucky's could terminate him "for any reason or for no reason at all." MCA § 39-2-904(2)(a). Similarly to

*Blehm*, this limitation prevents a probationary employee from stating a claim under the WDEA for a wrongful discharge based on an employer's violation of express personnel policies. *See* MCA § 39–2–904(2)(a). Thus, the motion to dismiss Count Three will be granted.

B. **Claim Preemption under Montana's WDEA**

Montana's WDEA is "the exclusive remedy for a wrongful discharge from employment." MCA § 39–2–902. Except as provided in the Act, "no claim for discharge may arise from tort or express or implied contract." MCA § 39–2–913. But the WDEA does not bar all tort or contract claims arising in the employment context. It bars only those claims that "are inextricably intertwined with and based upon" termination from employment. *Kulm v. MT State University-Bozeman*, 948 P.2d 243, 255–256 (Mont. 1997) (citing *Beasley v. Semitool, Inc.*, 853 P.2d 84, 86 (Mont. 1993)); *see also Kneeland v. Luzenac Am., Inc.*, 961 P.2d 725, 729 (Mont. 1998) (MCA § 39–2–913 "bars only those tort and contract claims which are 'for discharge' "). Essentially, other causes of action are precluded unless the plaintiff could bring the claim regardless of whether he was still employed and it was not contingent upon termination. *Kulm*, 948 P.2d at 246; *Daniels v. YRC, Inc.*, 2013 WL 449300, at *1 (D. Mont. Feb. 5, 2013). Thus, the Court must

address whether Jessup's remaining tort and contract claims are inextricably intertwined with and based upon his termination from employment.

### 1. **<u>Breach of Contractual Promise (Count One)</u>**

Count One alleges that Jessup was promised "that upon the store's initial success, which was to be gauged by its breaking even in terms of operating costs, he would thereupon be entitled to payment" of a $10,000 bonus. *ECF 1* at 7. He alleges he received the promise and assurance of benefits by Lucky's, including this "break-even bonus of $10,000 if achieved within the first 90 days of operations." *Id.* at 4. Jessup alleges that he "satisfactorily performed all of the conditions required on his part to be performed for the purposes of this aspect of the contractual arrangement, with the Billings store not only having met the break-even threshold but, in fact, having exceeded that goal." *Id.* at 6–7.

Based on the allegations contained in the Complaint, the Court concludes that Jessup has sufficiently pled this claim separately from his termination. Although Jessup alleges that Lucky's violated the bonus agreement "by having suddenly, unexpectedly and unjustifiably terminated Plaintiff Jessup's employment relationship, without having

tendered or paid the earned bonus in question[,]" the claim could have been filed regardless of his termination because it is premised on an allegedly earned bonus. At this initial stage of the proceedings, it appears that this claim is not entirely contingent upon his termination because the bonus was allegedly earned prior to termination, and Jessup could have brought the claim regardless of his termination. Thus, to the extent that it is not based on Jessup's termination from employment, the Court finds that Count One's contractual bonus claim is not subject to dismissal.

### 2. **Breach of Implied Covenant (Count Two)**

Count Two alleges that Jessup's "right to earn the above-referenced bonus contained an implied-in-law covenant of good faith and fair dealing, which required honesty in fact." *ECF 1* at 9. He alleges that Lucky's "breached the covenant of good faith and fair dealing by abruptly terminating the employment relationship and although said bonus should, in any event, have been paid, and they continued to exhibit bad faith conduct through their post-termination tactics[.]" *Id.* at 9.

Although Count Two is based in part on the break-even bonus claim alleged in Count One, portions of Count Two are premised on

Jessup's termination. *Id.* at 8–10. Jessup specifically alleges that Lucky's breached the covenant of good faith and fair dealing "by abruptly terminating" Jessup. *Id.* at 9. This portion of Count Two is inextricably intertwined with and based on Jessup's termination and therefore cannot be allowed to proceed.

But the remaining portion of the claim, however, is not necessarily based on Jessup's termination. Specifically, Jessup alleges the implied covenant stems from the parties' agreement about the break-even bonus. *Id.* at 8. From this agreement, he argues Lucky's breached the covenant because Lucky's should have paid and Lucky's further breached the covenant through its post-termination tactics.

Thus, Lucky's motion to dismiss Count Two will be denied to the extent that it is based on Jessup's bonus claim stated in Count One, but granted in all other respects.

### 3. **Defamation (Count Four)**

Jessup alleges that "in connection with the termination of his employment, and thereafter, the defendants knowingly, intentionally, and/or recklessly, made written and/or verbal statements and misrepresentations" that were "per se defamatory since they clearly impugned his good moral character and professional reputation by

falsely implicating that he was guilty of serious and scandalous wrongdoing[.]" *Id.* at 12.

Jessup alleges that, after his termination, he sought to obtain unemployment benefits and discovered that Lucky's claimed "that he purportedly had been guilty of serious misconduct in the form of alleged, but altogether false and unfounded accusations of 'sexual harassment.'" *Id.* at 6. He alleges that Lucky's,

> [V]igorously, relentlessly and maliciously continued to implicate that the plaintiff was guilty of this serious wrongdoing, which included their concerted efforts to oppose his potential entitlement to said benefits, both in connection with the determination of Plaintiff Jessup's initial application, as well as in an appeal of the same.

*Id.* at 6–7.

Here, the claimed defamatory statements regarding unemployment benefits are based upon Jessup's termination. Jessup would not have been seeking unemployment benefits had he not been discharged from his job. Thus, this portion of the claim is inextricably intertwined with, and based on his termination. *See Daniels*, 2013 WL at *3.

The defamation claim does, however, include allegations that are separate from employment termination. Jessup alleges that Lucky's

"knowingly, intentionally and/or recklessly, made written and/or verbal statements and misrepresentations that were published to co-workers, other food industry employees and third parties" that were per se defamatory because they "clearly impugned his good moral character and professional reputation by falsely implicating that he was guilty of serious and scandalous wrongdoing[.]" *Id.* at 12. These unspecified allegations, which are assumed to be true for the purposes of the instant motion, are pled separately and independently from his termination. Unlike statements made regarding unemployment benefits, statements made to co-workers, other food industry employees, and third parties, depending on the underlying evidence, may not be based upon Jessup's termination. Without more information, the Court must conclude, in considering the motion to dismiss and Lucky's arguments in support of the same, that Jessup has stated a plausible defamation claim that is not inextricably intertwined with his termination.

Thus, the Court will grant the motion to dismiss Count 4 to the extent it is based on statements made that are related to the employment termination, but deny it in all other respects.

### 4. **Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress (Counts Five and Six)**

Jessup alleges a claim for intentional infliction of emotional distress, stating that Lucky's,

> [I]ntentionally or recklessly, and with malicious motives, engaged in conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, so as to be regarded as utterly intolerable in a civilized society, such that it was likely to, and in fact did, cause the plaintiff serious emotional distress.

*ECF 1* at 14. In his claim for negligent infliction of emotional distress, Jessup alleges:

> In doing all of the things herein alleged, the defendant company and its responsible officers carelessly and recklessly engaged in the acts in question, even though they knew, or reasonably should have known, that such conduct would cause Plaintiff Jessup to suffer humiliation, mental anguish and emotional distress.

*Id.* at 15.

Jessup alleges that both of these claims are premised on Count Two, breach of implied covenant, and Count Four, defamation. *Id.* at 14–15. As discussed above, these Counts will be dismissed to the extent they rely on the allegedly wrongful termination. As a result, Counts 5 and 6 are also precluded to the extent they are based on Jessup's termination. But, because some portions of Counts Two and Four will

survive the motion to dismiss, the motion to dismiss Counts Five and Six will be denied to the extent these claims are based on the remaining portions of the breach of implied covenant and defamation claims.

## IV. **CONCLUSION**

Based on the foregoing, IT IS ORDERED that Defendant's motion to dismiss (*ECF 3*) Count Three is GRANTED. The motion to dismiss Counts One, Two, Four, Five and Six are GRANTED to the extent those claims are based on wrongful termination, but DENIED in all other respects.

DATED this 20th day of November, 2015.

*/s/ Carolyn S. Ostby*
United States Magistrate Judge